SH

**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Joseph Brummer,<br><br>        Plaintiff,<br><br>v.<br><br>Charles L. Ryan, et al.,<br><br>        Defendants. | No. CV 18-01146-PHX-DGC (JZB)<br><br>**ORDER** |

Plaintiff Joseph Brummer, who is currently confined in the Arizona State Prison Complex (ASPC)-Eyman, Browning Unit, has filed a pro se civil rights Complaint pursuant to 42 U.S.C. § 1983. Before the Court are the parties' cross Motions for Summary Judgment, which are ready for ruling. (Docs. 42, 43.) Also before the Court is Plaintiff's Motion for Status on Motion for Summary Judgment. (Doc. 50.)[1]

**I.    Background**

In his Complaint (Doc. 1), Plaintiff sued former Arizona Department of Corrections (ADC) Director Charles L. Ryan; Special Services Unit (SSU) Correctional Officer Figueroa; ASPC-Tucson Deputy Wardens A. Jacobs, D. Stemple, and J. Mattos; and ADC Security Operations Administrator Ron Towles for violating his due process rights. Plaintiff alleged the following facts: Plaintiff was validated as a member of the Aryan Brotherhood in 2009 and confined in Security Threat Group (STG) maximum custody.

---

[1] The Court provided notice to Plaintiff pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc), regarding the requirements of a response to Defendants' Motion for Summary Judgment. (Doc. 45.)

Plaintiff subsequently completed the STG step down program (SDP) and was placed in a close custody unit, which is a lower custody level. In September 2017, Defendant Figueroa informed Plaintiff that his close custody status was being revoked, but Figueroa refused to give Plaintiff the required form. Plaintiff had a revocation hearing on October 5, 2017 before Defendants Jacobs, Stemple, and Mattos, and his close custody status was revoked. Plaintiff was not given a copy of the hearing notification, informed of the evidence against him, or provided with a written result of the hearing. Plaintiff appealed the revocation to Defendants Towles and Ryan, and they denied his appeals. As a result, Plaintiff was returned to maximum custody. On screening pursuant to 28 U.S.C. 1915A(a), the Court found that Plaintiff stated a due process claim against Defendants and ordered them to answer. (Doc. 7.)

**II.  Summary Judgment Standard**

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co.*, *Ltd. v. Fritz Co.*, *Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however,

it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co.*, *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

### III. Relevant Facts[2]

#### A. ADC's STG Program

In 1991, ADC established an STG policy designed to reduce prison gang activity. (Doc. 44 (Defs.' Statement of Facts) ¶ 1.) Pursuant to this policy, SSU officers gather information on prisoners suspected of being in an STG. When enough information is collected, a validation packet is assembled and a Validation Hearing is held. (*Id.* ¶ 3.) If a prisoner is validated as an STG member, the prisoner is classified as a maximum custody prisoner. (*Id.*)[3]

A validated prisoner can have his custody level reduced from maximum custody by either: (1) renouncing his STG membership and debriefing about gang activities; or (2) successfully completing the SDP. (*Id.* ¶¶ 4–5.) Prisoners may renounce and debrief at any time. (*Id.* ¶ 6.) An STG-validated prisoner must notify ADC staff in writing of his

---

[2] These facts are taken from Defendants' Statement of Facts with accompanying exhibits (Doc. 44; Doc. 44-1; Doc. 49-1) and Plaintiff's Statement of Facts with accompanying exhibits (Doc. 47 at 14–55; Doc. 48). Many of Plaintiff's factual statements are merely arguments that do not cite to relevant, supporting portions of the record. To the extent Plaintiff's assertions do not cite to supporting record evidence, they will be disregarded. *See* Local Rule of Civil Procedure 56.1(b) ("for each paragraph of the moving party's separate statement of facts, [the opposing party must provide] a correspondingly numbered paragraph indicating whether the party disputes the statement of fact set forth in that paragraph *and a reference to the specific admissible portion of the record supporting the party's position* [for example, affidavit, deposition, discovery response, etc.] if the fact is disputed" (emphasis added)).

[3] The SSU consists of Corrections Officers who collect, assimilate, and document information concerning STG certification and individual validation packets. (Doc. 44 at n.1.)

desire to participate in the SDP. (*Id.* ¶ 7.) Participation in the SDP does not require renunciation or debriefing, but any indication of gang activity will result in removal from the SDP. (*Id.* ¶ 5.)

Prisoners who wish to participate in the SDP program are screened by SSU and the STG Unit to determine if they are eligible for the program.[4] (*Id.* ¶10.) The SSU's recommendation is reviewed by the Browning Unit Deputy Warden, the STG Supervisor, and the Security Ops Administrator and then submitted to a committee for final review and approval. (*Id.* ¶ 11.)

To be eligible to participate in the SDP, a prisoner must have successfully completed a 24-month period where he did not participate in any documented STG/gang activity or other behaviors including: assaultive or violent behavior, drug use or possession, extortion, threats toward staff or other prisoners, weapons violations, or a major disciplinary violation or more than three minor disciplinary violations within the last six months. (*Id.* ¶ 8.) The prisoner must also successfully complete a polygraph examination. (*Id.* ¶ 9.)

For prisoners housed at the Browning Unit, the SDP consists of three 180-day phases—Reintegration Phases I-III. (Doc. 44-1 at 24–25 (Department Order (DO) 806.08 § 1.5).) During Reintegration Phase I, a validated prisoner must participate in screening and evaluation with Mental Health Services staff and the Inmate Reintegration Team. The prisoner must also participate in several programs that focus on cultural diversity, high school equivalency exam preparation, and cognitive thinking. (*Id.*) During Reintegration Phase II, a validated prisoner must complete a job assignment as a Pod Porter, participate in peer group meetings, and complete any necessary treatment programs. (*Id.*) During Reintegration Phase III, a validated prisoner must participate in the following programs: substance abuse, two-person recreation periods, job assignments, conflict resolution, and domestic violence, and the prisoner must eat one meal per day while unrestrained in the pod with other step-down participants. (*Id.*)

---

[4] The STG Unit consists of the ADC Inspector General's staff who assist in the preparation of STG Threat Assessments and individual validation packets and conduct debriefings of renounced STG members. (Doc. 44 at n.2.)

If a prisoner successfully completes the SDP within 18 months and passes a polygraph, he is eligible to have his custody level reduced from maximum custody to close custody. (Doc. 44 ¶ 14.) The first four weeks after the prisoner's transfer to close custody is Phase IV of the SDP and consists of gradually reducing the restrictions on the prisoner's movements while gradually increasing the prisoner's privileges and contact with other close custody prisoners. (Doc. 44-1 at 26–28 (DO 806.10 §§ 1.2–1.6).) Upon completion of Phase IV, and the prisoner's successful transition to close custody, Phase V begins and consists of an indefinite period of monitoring. (*Id.* at 28 (DO 806.10 § 1.7; Doc. 44 ¶ 15.)

Recommendations to remove a prisoner from the SDP must be approved by the STG Validation Hearing Committee and may be appealed by the prisoner to the STG Appeals Committee. (*Id.* ¶ 16.) A prisoner can be removed from any phase of the SDP, or returned to repeat any phase of the SDP, upon documented confirmation that the prisoner has engaged in any of the following conduct: assaultive/violent, extortive, or threatening behavior towards staff or other prisoners; weapons violations; cell phone violations/ unauthorized communications; drug use, possession, or conspiracy; or STG/gang activity. (*Id.* ¶ 17.) Whether a prisoner is to be removed from the SDP program or returned to repeat a previous phase is determined by the STG Validation Hearing Committee. (*Id.* ¶ 18.)

According to the version of DO 806 that became effective July 12, 2017, if a prisoner is recommended to be removed from the SDP, the SSU Coordinator must deliver to the prisoner, at least 10 business days prior to the hearing, a Hearing Notification/Step-Down Revocation Form 806-10 to allow the prisoner to prepare a defense. (*Id.* ¶ 19; Doc. 44-1 at 4 (Towles Decl. ¶ 21); Doc. 44-1 at 29 (DO 806.11 § 1.2).) The Form 806-10 did not become available, however, until October 18, 2017. (Doc. 44-1 at 61 (Trausch Decl. ¶ 9); *see* Doc. 44-1 at 2 (Defs.' Ex. 3, Attach. A).)

A Revocation Hearing is similar to a Validation Hearing; the prisoner can submit witness questions, but he cannot directly interrogate witnesses. (Doc. 44 ¶ 20.) Prisoners who are removed from the SDP are not eligible to re-apply for two years. (*Id.* ¶ 24.)

The STG Appeals Committee is authorized to modify any sanctions imposed by the STG Validation Hearing Committee. (*Id.* ¶ 21.) The STG Appeals Committee's decisions are final, and no further appeals will be considered. (*Id.*) If a prisoner informs the STG Appeals Committee that he did not receive proper notice of the Revocation Hearing, and the lack of proper notice is confirmed, a new Revocation Hearing will be conducted. (*Id.* ¶ 23.)

### B. ADC Maximum Custody Management

ADC Department Order 812 covers the Inmate Maximum Custody and Management Incentive System. (*Id.* ¶ 25.) Under this system, maximum custody prisoners are permitted to work through a step-based incentive program in order to participate in jobs, programs, and other out-of-cell activities. (*Id.*) The Program Team conducts monthly reviews to determines prisoners' step levels. (*Id.* ¶ 26.)

Prisoners begin the program in Step I, the most restrictive step, and may progress to Step III, the least restrictive step. (*Id.*) Prisoners housed at Browning Unit are eligible for Step II after a minimum of 30 days in Step I, and for Step III after a minimum of 30 days in Step II. (*Id.* ¶ 27.) Step III privileges include receiving three 2.5-hour blocks of recreation time per week inside the 10x10 interactive enclosure; getting two 2-hour, non-contact visits per month; getting one 15-minute phone call per week; and being allowed to spend up to $20 per week at the inmate store. (Doc. 44-1 at 51–52 (Defs.' Ex. 2).)

### C. Plaintiff's First SDP Revocation Hearing and Appeal

Plaintiff was validated as a member of the Aryan Brotherhood STG in August 2009. (Doc. 44 ¶ 29; Doc. 1 at 6, ¶ 4.) At some point thereafter, Plaintiff was approved for, and began participating in, the SDP. (Doc. 1 at 6, ¶ 6.) On September 8, 2017, Defendant Figueroa verbally informed Plaintiff that he was being removed from the SDP and that he would have a Revocation Hearing on October 5, 2017. (Doc. 44 ¶ 30; Doc. 1 at 6, ¶ 12.) Defendant Figueroa gave Plaintiff an Assignment to Investigative Detention Form 2A that stated:

> This action is being taken because you are considered a suspect in an offense occurring within the Institution that is triable under the criminal laws of the state of Arizona, or have been charged with an offense that could result in your being charged with a major disciplinary violation and which requires your detention until an investigation is complete.
>
> You are assigned to Investigative Detention while the investigation is underway and determination is made regarding the referral of this matter to the proper county authorities for possible prosecution or until the disciplinary investigation is completed. The investigation will be completed within 30 days of the alleged offense. During this period, you may continue to be housed in Investigative Detention.
>
> Your personal property will be searched and those items that have no bearing on the investigation and which are not contraband or unauthorized property will be returned to you. If charges are not referred or filed within the prescribed time limits, or if they are filed and dismissed, your status will be reviewed and you will be so notified. You may be reclassified to another status at any time.

(Doc. 44-1 at 66 (Defs.' Ex. 4).) The Form 2A was dated September 8, 2017 and signed by Plaintiff and Defendant Figueroa. (*Id.*)

On October 5, 2017, a Revocation Hearing was held and the STG Validation Hearing Committee reviewed the SSU's evidence against Plaintiff. (Doc. 44 ¶ 31; Doc. 44-1 at 68 (Defs.' Ex. 5).) The members of the committee included Defendants Jacobs, Stemple, and Mattos. (Doc. 44-1 at 68 (Defs.' Ex. 5).) The Result of STG Validation Hearing Form 806-4 stated:

> The [STG Validation Hearing Committee] has determined the evidence submitted by Tucson SSU is sufficient for revocation from the step-down program. It should be noted; during the revocation hearing Inmate Brummer 160622 stated to the [Committee] that he has maintained association with known STG Aryan Brotherhood members/associates throughout his time in the step-down program.

(*Id.*)

On October 6, 2017, Plaintiff appealed the Committee's decision. (*Id.* at 70–73 (Defs.' Ex. 6).) In a response dated November 16, 2017, Defendant Towles, the STG Appeals Committee Chair, informed Plaintiff that his appeal was denied. (*Id.* at 75–76 (Defs.' Ex. 7).) The denial was based on evidence provided by confidential informants that Plaintiff had been involved in gang activity and had given orders to have another prisoner killed. (*Id.* at 75; Doc. 44 ¶ 33.)

On December 31, 2017, Plaintiff filed an informal complaint under ADC's administrative grievance procedure, which is outlined in DO 802. Plaintiff alleged that he was not given a Form 806-10 prior to his Revocation Hearing and was not afforded an opportunity to prepare a defense or call witnesses. ((Doc. 44 ¶ 35; Doc. 44-1 at 78 (Defs.' Ex. 8).) Plaintiff pursued this grievance all the way to a final appeal to the ADC Director's Office. (*See* Doc. 44-1 at 79–89 (Defs.' Exs. 9–12).) On March 1, 2018, ADC Deputy General Counsel Glynn responded to Plaintiff's grievance appeal on behalf of Defendant Ryan pursuant to Defendant Ryan's authority under Arizona Revised Statutes § 41-1604(B)(2)(d). (Doc. 44-1 at 89 (Defs.' Ex. 13).)[5] Glynn's response denied Plaintiff's appeal and stated, in relevant part, that Plaintiff was "given more than ten business days [sic] notice prior to [his] hearing and provided an opportunity to appeal the findings of the hearing, which was upheld." (*Id.*)

### D. Plaintiff's New Revocation Hearing and Appeal

A new SDP Revocation Hearing was scheduled for Plaintiff on June 12, 2019, presumably to cure the deficient notice from the first hearing. (Doc. 44 ¶ 43.) On May 24, 2019, Plaintiff was given a Form 806-10 that stated: "ASPC-Tucson/Rincon unit SSU recommends Inmate Brummer's status as an STG Step-Down participant is evaluated due to violating the STG Step-Down program policy by participating in activity that adversely affected the orderly operation of the institution." (Doc. 44-1 at 91 (Defs.' Ex. 14).) The Form 806-10 noted that Plaintiff was suspected of participating in STG/gang activity and

---

[5] Arizona Revised Statute § 41-1604(B)(2)(d) authorizes the ADC Director to "[d]elegate to appropriate personnel the administrative functions, powers or duties that the director believes can be competently, efficiently and properly performed."

that the evidence to be introduced at the Revocation Hearing would include testimony regarding a phone conversation overheard by SSU in which prisoner Zawacki stated that Plaintiff had been flexing his "political muscles" on the Rincon yard; a CD containing a recording of the Zawacki phone call; several Information Reports documenting information obtained from four confidential informants; Confidential Informant Reliability Assessment Questionnaires (CIRAQ) from each of the confidential informants; and a confidential memorandum authored by STG investigator Steve Garcia. (*Id.*)

Plaintiff had a new Revocation Hearing on June 12, 2019 in front of entirely different hearing officers. Defendants did not participate in the second Hearing. (Doc. 44 ¶ 45.) The second STG Validation Hearing Committee determined that the evidence was sufficient to remove Plaintiff from the SDP. (*Id.* ¶ 46; Doc. 44-1 at 93 (Defs.' Ex. 15).)

On June 13, 2019 Plaintiff appealed the Committee's findings. (Doc. 47 at 48–55 (Pl.'s Ex. 8).) In a memorandum dated July 3, 2019, Plaintiff's appeal was denied by the STG Appeals Committee. (Doc. 47-1 at 1–2 (Pl.'s Ex. 8).) Defendants did not participate in the second appeal. (*See id.*)

**IV.     Plaintiff's Motion for Summary Judgment**

Plaintiff fails to set forth or discuss the relevant legal standards for obtaining summary judgment, and he did not file a statement of facts with his Motion for Summary Judgment. His Motion fails to comply with the Local and Federal Rules of Civil Procedure governing summary judgment motions. *See, e.g.,* Fed. R. Civ. P. 56(c); LRCiv 56.1(a) (requiring a separate statement of facts that refers to the specific admissible portion of the record where the facts find support). Accordingly, Plaintiff's Motion for Summary Judgment will be summarily denied.

**V.      Defendants' Cross Motion for Summary Judgment**

Defendants argue that they are entitled to summary judgment because Plaintiff's participation in the SDP did not create a liberty interest and because Plaintiff was given a second Revocation Hearing that complied with due process. Defendants also argue that they are entitled to qualified immunity. (Doc. 43.)

### A. Qualified Immunity

#### 1. Legal Standard

Government officials enjoy qualified immunity from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In deciding if qualified immunity applies, a court must determine: (1) whether the facts alleged show the defendant's conduct violated a constitutional right; and (2) whether that right was clearly established at the time of the violation. *Pearson v. Callahan*, 555 U.S. 223, 230-32, 235–36 (2009). Courts have discretion in deciding which of these two prongs to address first depending on the circumstances. *Id.*

For a right to be clearly established, there does not have to be a case directly on point, but "'existing precedent must have placed the statutory or constitutional question beyond debate.'" *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2017)). A right is clearly established when case law has been "earlier developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law." *Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110, 1117 (9th Cir. 2017) (citing *White*, 137 S. Ct. at 551). If there is no Supreme Court or Circuit Court precedent, courts "'look to whatever decisional law is available to ascertain whether the law is clearly established' for qualified immunity purposes, 'including decisions of state courts, other circuits, and district courts.'" *Boyd v. Benton Cnty.*, 374 F.3d 773, 781 (9th Cir. 2004) (quoting *Drummond v. City of Anaheim*, 343 F.3d 1052, 1060 (9th Cir. 2003)).

#### 2. Analysis

In analyzing a due process claim, the Court must first decide whether Plaintiff was entitled to any process and, if so, whether he was denied any constitutionally-required procedural safeguard. Liberty interests that entitle an inmate to due process are "generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force,

1  nonetheless imposes atypical and significant hardship on the inmate in relation to the
2  ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995) (internal
3  citations omitted).

4  To determine whether an inmate is entitled to the procedural protections afforded
5  by the Due Process Clause, the Court must look to the particular restrictions imposed and
6  ask whether they "'present the type of atypical, significant deprivation in which a state
7  might conceivably create a liberty interest.'" *Mujahid v. Meyer*, 59 F.3d 931, 932 (9th Cir.
8  1995) (quoting *Sandin*, 515 U.S. at 486). "Atypicality" requires not merely an empirical
9  comparison, but turns on the importance of the right taken away from the prisoner. *See*
10 *Carlo v. City of Chino*, 105 F.3d 493, 499 (9th Cir. 1997). To determine whether the
11 sanctions are atypical and a significant hardship, courts look to the prisoner's conditions of
12 confinement, the duration of the sanction, and whether the sanction will affect the duration
13 of the prisoner's sentence. *See Keenan v. Hall*, 83 F.3d 1083, 1088-89 (9th Cir. 1996).

14 It is well-settled that placement in maximum security segregation units implicates a
15 liberty interest requiring due process protections. *Wilkinson v. Austin*, 545 U.S. 209, 224
16 (2005). A prisoner may be deprived of his liberty interest as long as he is accorded the
17 proper procedural protections.

18 It is also well-settled that, for the initial decision to place a prisoner in maximum
19 custody, due process is generally satisfied if the prisoner is given written notice of the
20 factual basis for the placement and an opportunity to be heard. *Id.* at 225-27; *Hewitt v.*
21 *Helms*, 459 U.S. 460, 476 (1983), *overruled in part on other grounds by Sandin*, 515 U.S.
22 472. But Plaintiff's due process claim in this case does not arise from his *initial* STG
23 validation and assignment to maximum custody in the Browning Unit. Instead, Plaintiff
24 claims that he was entitled to, and was denied, due process when he was subsequently
25 removed from the SDP and returned to maximum custody at the Browning Unit.

26 Although it was clearly established at the time Plaintiff's claim arose that the initial
27 decision to place a prisoner in a maximum custody unit created a liberty interest and
28 required notice and a chance to be heard, the Court is not aware of any Supreme Court or

Ninth Circuit case law that examines whether a maximum custody prisoner's participation in a program like the SDP creates a liberty interest, and what if any process is due to the prisoner before he is removed from such a program and returned to maximum custody. This Court has previously held that an STG-validated prisoner is not entitled to an alternative means to exit maximum custody, such as the SDP, if annual reviews and debriefing/renouncing are available. *See Freemon v. Ryan*, No. CV 09-1717-PHX-JAT (JRI), 2011 WL 5169342, at *14 (D. Ariz. Oct. 31, 2011); *Hernandez v. Schriro*, No. CV 05-2853-PHX-DGC (JJM), 2011 WL 2910710, at *9 (D. Ariz. Jul. 20, 2010). Further, in *Muhammad v. Hood*, 100 Fed. Appx. 782, 783 (10th Cir. 2004), the Tenth Circuit found that removing a prisoner from a step-down program to a more restrictive unit does not give rise to a liberty interest. *See also Ajaj v. Federal Bureau of Prisons*, No. 08-CV-2006-MSK-MJW, 2011 WL 902440, at *11 (D. Colo. Mar. 10, 2011) (being denied access to or being terminated from a step-down program does not impose an atypical and significant hardship); *Georgacarakos v. Wiley*, No. CV 07-01712-MSK-MEH, 2008 WL 4216265, at *20 (D. Colo. Sept. 12, 2008) (a prisoner does not have a liberty interest in being admitted to a step-down program, where admission "is subject to the discretion of prison officials").

Thus, even assuming that the failure to provide Plaintiff with a Form 806-10, or any other sufficient written notice, prior to his October 5, 2017 Revocation Hearing amounted to a due process violation, at that time there was no clearly established law that Plaintiff had a protected liberty interest in his participation in the SDP. Under then-existing law, a reasonable official in Defendants' position would not have known that removing Plaintiff from the SDP without sufficient notice would violate Plaintiff's constitutional rights. Even though DO 806 entitled Plaintiff to receive a Form 806-10 before his Revocation Hearing, violation of a prison regulation that requires certain procedures does not, in and of itself, result in a violation of due process. Plaintiff has not presented evidence showing that the constitutional right was clearly established. Accordingly, Defendants are entitled to qualified immunity as to Plaintiff's claim for monetary damages, and summary judgment will be granted to Defendants in their individual capacities.

### B. Injunctive and Declaratory Relief

Qualified immunity is only an immunity from a suit for damages. "Qualified immunity . . . does not bar actions for declaratory or injunctive relief." *Los Angeles Police Protective League v. Gates,* 995 F.2d 1469, 1472 (9th Cir.1993) (quoting *Am. Fire, Theft & Collision Managers, Inc. v. Gillespie,* 932 F.2d 816, 818 (9th Cir.1991)). Plaintiff seeks injunctive and declaratory relief consistent with a ruling that his due process rights were violated during the initial SDP revocation proceedings and an order reversing the STG Validation Hearing Committee's findings, reinstating Plaintiff to the SDP, and returning Plaintiff to close custody housing. (Doc. 1 at 8.)

Plaintiff's claim for injunctive relief must be denied. The evidence shows that on May 24, 2019, Plaintiff was given a Form 806-10 that provided a summary of the charges against him, the date of his new SDP Revocation Hearing, and a list of the evidence that would be presented against him at the hearing. On June 12, 2019, Plaintiff had a new hearing in front of an entirely different panel; none of the Defendants participated in the new hearing. The new panel determined that the evidence was sufficient to remove Plaintiff from the SDP. Plaintiff appealed this finding, and the new panel's decision was upheld by a new appeals committee in which Defendants did not participate. Thus, the unrefuted evidence shows that Plaintiff was provided with notice and an opportunity to be heard, and he had his revocation proceedings reheard by new panels. Plaintiff's requests to have the decision from the first Revocation Hearing reversed, to be reinstated to the SDP, and to be returned to close custody are based on the lack of written notice at the first Revocation Hearing, but that lack of notice was remedied at the June 12, 2019 hearing. The Court finds no basis to set aside the findings of the second Revocation Hearing and appeal. Plaintiff's claim for injunctive relief will be denied.

As to Plaintiff's claim for declaratory relief, the Court must determine what type of declaratory relief is at issue: retrospective declaratory relief would declare that the defendant committed constitutional violations in the past; prospective relief would declare that likely future actions are unconstitutional. *See Nat'l Audubon Society, Inc. v. Davis*,

307 F.3d 835, 847-48 & n. 5 (9th Cir. 2002). The Eleventh Amendment bars claims seeking only retrospective declaratory relief. *See Green v. Mansour*, 474 U.S. 64, 71-73 (1985) (Eleventh Amendment barred retrospective declaratory relief against state officials); *Porter v. Jones*, 319 F.3d 483, 491 (9th Cir. 2003) ("suits against an official for prospective relief are generally cognizable, whereas claims for retrospective relief (such as damages) are not").

In his Complaint, Plaintiff seeks a declaratory judgment that Defendants' actions during his initial SDP revocation proceedings violated DO 806 and Plaintiff's due process right. (Doc. 1 at 8.) Plaintiff has since been given a new Revocation Hearing in which he received proper notice via a Form 806-10. The declaratory relief sought by Plaintiff is retrospective in nature and barred by the Eleventh Amendment. Accordingly, Plaintiff's claim for declaratory relief will be denied.

**IT IS ORDERED:**

(1) The reference to the Magistrate Judge is withdrawn as to Plaintiff's Motion for Summary Judgment (Doc. 42), Defendants' Motion for Summary Judgment (Doc. 43), and Plaintiff's Motion for Status on Motion for Summary Judgment (Doc. 50).

(2) Plaintiff's Motion for Summary Judgment (Doc. 42) is **denied**.

(3) Defendants' Motion for Summary Judgment (Doc. 43) is **granted** and this action is **dismissed** with prejudice.

(4) Plaintiff's Motion for Status on Motion for Summary Judgment (Doc. 50) is **granted** to the extent that this Order informs him of the status of this action.

(5) The Clerk of Court shall terminate this action and enter judgment.

Dated this 21st day of February, 2020.

David G. Campbell
Senior United States District Judge